# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# NEW ALBANY DIVISION

| | |
|---|---|
| JUSTIN EVANS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:16-cv-00160-TWP-DML |
| | ) |
| PATRICK ALUMINUM, INC. | ) |
| d/b/a ALTEC ALUMINUM | ) |
| TECHNOLOGIES, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Patrick Aluminum d/b/a Altec Aluminum Technologies ("Altec"). (Filing No. 33). Plaintiff Justin Evans ("Evans") initiated this action against Altec, his former employer, alleging violations under the American with Disabilities Act, as amended, 42 U.S.C. §12101 *et. seq.* and Indiana law. For the reasons set forth below, the Motion for Summary Judgment is **granted.**

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Evans as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Evans began working at Altec through Manpower staffing agency in April 2013 and secured full-time employment there in June 2013. (Filing No. 33-4 at 14.) During his employment at Altec he was a member of the International Chemical Workers Union Council Local 15-C. In November 2014, Evans injured his knee in a workplace accident when the left side of his body fell into a pit. *Id.* at 7-8. The day after his injury, he was cleared for light duty work pending an MRI

of his knee. *Id.* at 9–10. A first MRI showed that Evans's knee was "a hundred percent clear," but a second MRI revealed otherwise. *Id.* at 11–12. Evans eventually retained an attorney and, in January 2015, filed for worker's compensation. *Id.* In February 2015, he began physical therapy. *Id.* at 12. Throughout this time, Evans remained on light duty work restrictions. *Id.* These restrictions included no climbing, kneeling, crawling, and lifting over ten pounds. *Id.* at 24. Evans was also instructed to sit as much as possible. *Id.*

Despite Altec's awareness of Evans' restrictions, his supervisor, Charlie[1], assigned Evans work orders that did not reflect his light duty restrictions. ([Filing No. 33-4 at 12-13](), [24]().) For example, Evans was assigned work orders that required him to climb a ladder—a task that does not meet the "light duty" requirement. *Id.* In this and other similar circumstances, Evans would comply with his restrictions and would not complete the requested tasks. *Id.* As a result, Charlie verbally disciplined him for not completing the requested work orders. Evans would explain his restrictions to his supervisor, and Charlie would say, "Well, you have a job to do. . . . You need to do your job." *Id.* Although Evans was verbally reprimanded, his supervisor never initiated any formal or written discipline. This scenario would occur about four or five times a week. *Id.* Although Evans' past experiences with the plant manager, James Peele ("Peele") were favorable, he did not report Charlie's behavior to Peele or any other Altec supervisor. *Id.* at 56.

After his injury, Evans also began finding notes left on his work equipment that suggested that he should be looking for new employment. ([Filing No. 33-4 at 29-30]().) One such note read, "I need to know when you're starting your new job and you need to get your tools gone." *Id*. That note bore Charlie's signature. *Id.*

---

[1] Charlie's last name is not disclosed in Evans's deposition (Evans cannot remember it). He is likewise never discussed or identified in any other filing. Because Charlie's actions directly relate to the harassment Evans experienced (with the facts presented in the light most favorable to Evans), Evans's experiences with Charlie are included here.

Charlie was not the only person who expressed these sentiments towards Evans. If Evans was working with other individuals, including co-worker, Larry Curry ("Curry"), they would often berate him by saying things like "I'm tired of working all these extra hours to cover for you because you can't work it," or "You need to find a new job or you need to hurry up and do your job." *Id.* at 31–32. In one instance, Evans and Curry almost became involved in a physical altercation after Curry told Evans that "if [Evans] [couldn't] bend down there to help [Curry] pull a damn electrical line, [Curry] [would] make [Evans] get down there and pull an electrical line." *Id.* at 32–33. While no physical fight occurred, Curry called Evans a "stupid son of a bitch" and told him "you ain't nothing." *Id.* at 33. In another instance, Evans asked Curry to grab a piece of equipment only accessible by ladder; Curry responded by throwing the ladder and saying, "There you go, you worthless son of a bitch. There's the ladder," recognizing that Evans could not climb it. *Id.* Before Evans's injury, Evans and Curry had enjoyed a working relationship; it was only after Evans went on light duty these problems began. Evans reported these events to his union, but he did not report them to any superiors at Altec. ([Filing No. 33-4 at 32, 34](#).)

In the early months of 2015, Evans found that his truck had been vandalized in the Altec parking lot during his shift. *Id.* at 36. The truck, which was green, had been spray-painted with yellow safety paint. *Id.* The only portion of the truck that did not get touched by the paint was the roof of the truck's cab. *Id.* Across the rest of the truck, squiggly lines and profanity had been painted. *Id.* Evans did discuss the vandalism with Laurie Ireland ("Ireland") *Id.* at 37, Altec's Employee Health and Safety (EHS) manager. ([Filing No. 33-3 at 2](#).) Evans was returning from the parking lot after finding his truck vandalized, and Ireland asked, "What happened to your truck?" *Id.* Evans replied, "It's kind of obvious somebody spray painted it, now didn't they?" Ireland did not reply, and Evans noticed that the can of yellow safety spray paint was missing from in front of

3

Ireland's office. (Filing No. 33-4 at 37.) Evans asked Ireland what happened to the paint, and she responded that she did not know. Ireland asked if Evans was going to get his truck painted, as Ireland took offense to some of the profanity on the truck. (Filing No. 35-1 at 6.) Evans said he planned to go that day to get a quote for a new paint job for the truck. *Id.*

Aside from the one exchange with Ireland, Evans did not discuss the vandalism with any other Altec superior. Immediately after the vandalism, Evans attempted to speak with Peele but was told that Peele was not available. (Filing No. 33-4 at 37.) Evans did not make any further attempts because he felt as though Peele "never wanted to talk to [him]." (Filing No. 35-1 at 6). He did report the vandalism incident to his union. *Id.* at 11.

Shortly after the vandalism to his truck, Evans found his toolbox that he used at Altec had been vandalized as well. *Id.* at 12. The toolbox had eight drawers and was roughly five feet tall. *Id.* Evans personally owned the toolbox and the tools it contained. *Id.* He discovered the locks on the toolbox had been cut, and the entire box had been flipped over, with the drawer sets on the ground. *Id.* Evans' tools were scattered throughout the shop. *Id.* at 13. He reported the incident to his union, and union representatives accompanied Evans to speak with Richard Parrish ("Parrish"). *Id.* Parrish served as a foreman at Altec when no other supervisors were available. *Id.* Parrish's response was that he was not worrying about it and it was not his problem because he was not a maintenance supervisor.[2] *Id.*

The next day, Evans found the lock on his toolbox had been broken again, and many of his tools were missing. (Filing No. 33-4 at 38-39.) This time, Evans called the police, who met him in the Altec parking lot in order for Evans to file a police report. *Id.* Evans never obtained the police report, nor did he file any formal or written grievance with Altec. *Id.* Evans took his remaining

---

[2] Parrish was the second shift foreman for production, however the foreman on shift for production is supposed to be the foreman over everyone when no other supervisors are there. (See Filing no. 35-1 at 13-14).

tools home, but Charlie told him that he did not care that Evans took his tools home after some went missing and to bring the tools back. *Id.* Evans also discussed the theft with Parrish, whose response the second time was "I guess you'd better buy a better box." *Id.* Evans never talked to Peele about any of the incidents of harassment. *Id. at 47.*

In April 2015, Mike Roach ("Roach") began working at Altec as a maintenance tech. *Id.* at 34. Evans had been told the previous month that he was not eligible for promotion to maintenance tech because Altec did not have any such positions open. ([Filing No. 35-1 at 15](#).) Roach's first words to Evans were, "They hired me to take your spot." ([Filing No. 33-4 at 34](#).) Over time, Roach—knowing Evans's work restrictions—would say things to Evans like, "You can either go up [the ladder] to get my wrenches or we can figure out some other way you're going to get my wrenches." Evans did not report these incidents to a supervisor. *Id.* Charlie left employment with Altec in May 2015 and Eddie Reyes ("Reyes") became Evans' new supervisor. *Id*. at 30-31.

Because the reservoirs beneath the aluminum presses would catch rainwater in addition to the water coming off the presses, one of Evans' duties was to remove waste water and oil from containment reservoirs beneath Altec's presses. *Id.* at 42. In order to empty the reservoir, Evans was required to use a forklift to maneuver a 300-gallon tote and then pump the water and oil into the tote. *Id.* After emptying a reservoir into a tote, Evans would place the tote in storage so that the water and oil could separate, with the water sinking to the bottom. *Id.* Evans did not typically handle the totes after this stage in the process, but the totes' contents were often run through a centrifuge or taken directly to a wastewater processing system. *Id.* at 43.

In early July 2015, there was a significant rainstorm. *Id*. The rainstorm affected Evans' duties in that one of the reservoirs collected rainwater in addition to waste from the press. *Id*. After the storm, that reservoir was filled mostly with water ("75/15 split water versus oil"). Evans

5

emptied the reservoir into the tote, and was instructed by Reyes to let the totes settle in storage as usual. ([Filing No. 33-4 at 43](#).)

Later that same week, Reyes told Evans that they would be disposing of the waste from the totes "tonight after they've [one] hundred percent settled." *Id.* at 45. Reyes then left for the day. *Id.* Later that evening, Evans was approached by Roach and Curry and Curry instructed him to get a forklift in order to begin handling the totes. *Id.* Roach and Curry told Evans to bring the totes to the back door of the facility and to empty the contents of the totes out the door. *Id.* at 46. Evans knew that it violated Altec policies to dump the tote's contents into the street, so he initially refused. *Id.* at 45, 47. Curry replied that since Reyes was not present, he was the acting supervisor, and Curry warned "if you don't want to do it, you can go home now and I will make sure you don't have a job tomorrow morning." *Id.* Evans continued to confront Curry, but Curry maintained, "If I have to, I will call James Peele up right now and have you terminated right here, right now." *Id.* at 46. While Evans knew that Curry was not his official supervisor, he was concerned for his job, given his need to support his family including a newborn baby, and believed Curry had the ability to convince Peele to fire him. *Id.* at 47–48. Evans did not believe he could reach another supervisor or Peele to consult with them, given the late hour of the night. *Id.* at 50–51. Evans eventually complied by emptying the totes out the back door. *Id.* at 45. Evans told Roach and Curry, "You know I'm going to end up getting screwed for this." *Id.* at 46. The two replied, "You can either get screwed down the road or you can get screwed now and not have a job." *Id.* Evans stopped emptying the first tote before it had emptied and told Roach and Curry that he was done. Roach reminded him that he had "one more to do." *Id.* Evans emptied half of the second tote before stopping again and saying, "I'm done. Don't ask me to do another thing because if that be the case, I will walk straight the heck out of here and I will be on the phone with the sheriff's department.

6

Do not ask me for another thing." *Id.* Evans then resumed his normal duties before leaving for the night. *Id.* Evans was aware that the oily wastewater ended up in a public storm drain. *Id. at 47.*

On July 16, 2015, a co-worker reported witnessing Evans dumping a 300 gallon tote of liquid from the garage door behind the die shop, and that the contents of the tote appeared to be both oil and water. When he reported for his shift on July 17, 2015, Ireland instructed Evans to grab his tools and report to the front. ([Filing No. 33-4 at 46](#).). Ireland then informed Evans that he was suspended for improperly emptying the totes. *Id.* at 47. Evans printed his name and dated an acknowledgment of his suspension. *Id.* at 50. In the following days, Peele conducted an investigation, which involved interviewing numerous people and collecting statements from Reyes, Curry, and Roach. ([Filing No. 33-1 at 4](#)). Peele found that he could not substantiate any claim that Evans dumped the wastewater under the direction of any other co-worker. *Id.* Criminal charges were filed and Evans pled guilty to unlawful dumping. ([Filing No. 33-4 at 53](#)).

On July 30, 2015, Peele made the decision to terminate Evans for dumping the wastewater in violation of Altec's written policies. *Id.* The decision was retroactive to July 17, 2015, the date of Evans's suspension. *Id.* On August 20, 2015, Evans met with Peele and union representatives. In that meeting, Peele informed Evans that he had been terminated. *Id.* at 54. The reason provided for Evans's termination involved the unlawful dumping. *Id.* Altec never asserted that Evans's disability or worker's compensation claim was in any way involved in his termination. *Id.* at 55. No other Altec employees have been known to improperly dispose of tote contents. *Id.* at 57.

## II.     LEGAL STANDARD

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986). Federal Rule of Civil Procedure 56

provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. DISCUSSION

Evans contends that Altec terminated his employment based on his disability and in retaliation for his filing of a worker's compensation claim. (Filing No. 1 at 5.) He alleges that, in so doing, Altec discriminated against him based on his disability and in violation of the American's with Disabilities Act ("ADA"). (Filing No. 1 at 4.) Altec responds that Evans was terminated after he admitted to dumping a mixture of oil and water into a public storm drain, a violation of both Indiana law and company policy. (Filing No. 34 at 1). The Court will address each argument in turn.

### A. Disability Discrimination

A plaintiff may show unlawful discrimination through the direct method or, alternatively, through the indirect burden-shifting mechanism established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may offer direct or circumstantial evidence to prove discrimination. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that the adverse employment action was impermissibly discriminatory. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff satisfies this burden, then the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The burden then shifts back to the plaintiff to submit evidence that the employer's stated reason is pretextual. *Id.*

The plaintiff establishes a *prima facie* case of discrimination by presenting evidence that would allow a reasonable jury to find that: (1) he is a member of a protected class; (2) he performed satisfactorily on the job in accordance with her employer's legitimate expectations; (3) despite his

reasonable performance, he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Rhodes*, 359 F.3d at 504.

Regardless of whether a plaintiff uses the direct method, indirect method, or both methods, "the legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected class status] caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* "Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Id.* The sole question that matters is whether a reasonable juror could conclude that the plaintiff would have kept her job if he was simply not a member of a given protected class. *See Achor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F. 3d 734, 736–37 (7th Cir. 1994). It is undisputed that Evans is a member of a protected class or that he was disabled. ([Filing No. 35 at 10](Filing No. 35 at 10)).

Evans' termination decision hinges on one incident; his dumping a mixture of oil and water into a public storm drain, in violation of both Indiana law and Company policy. Evans worked for Altec for approximately two years before his termination and was aware of the policy regarding dumping. ([Filing No. 34 at 1](Filing No. 34 at 1)). As noted previously, Evans concedes that he dumped the mixture into the public storm drain and that he knew it was a violation. He contends that he was following Altec's legitimate expectations at the time of his termination by following direct orders from Curry, an acting supervisor. ([Filing No. 33-4 at 45](Filing No. 33-4 at 45)).

Altec notes that Evans made no attempt to contact his own supervisor or any other member of plant management in advance of the unlawful dumping. Altec asserts that it performed due diligence before making the termination decision. Evans was suspended pending an investigation, and the investigation did not substantiate that Evans was acting at the direction of Altec management or a co-worker. ([Filing No. 35 at 15](#)). Evans argues that a question of material fact exists because Curry denies that he directed Evans to dump the wastewater out back. However, accepting as true that Curry did direct Evans to dump the waste materials into the public storm drain, Evans knew the order was a violation of both Indiana law and company policy, and he did not report the incident to any supervisors or his union ([Filing No. 33-4 at 50-51](#)). Where an employee is responsible for knowing policy and fails to comply with it, the employee cannot be said to be meeting his or her employer's legitimate expectations. *Gill v. Cty. of LaPorte,* No. 3:11-CV-457, 2014 WL 523055, at *12 (N.D. Ind. Feb. 7, 2014). Moreover, attempts to shift blame by placing shared responsibility for violation of company policy are generally not useful. *Id.* In addition to admitting that that he failed to comply with company policy, Evans pled guilty to the criminal offense of unlawful dumping and was sentenced to time-served. ([Filing No. 33-4 at 53](#)). The Court determines there are no genuine issues of material fact regarding Evans' failure to meet Altec's legitimate expectations.

The Court next turns to whether or not similarly-situated employees outside of Evans protected class were treated more favorably. Evans argues that Roach and Curry are similarly-situated co-workers outside his protected class who were treated more favorably. He asserts that Roach was present at the time when Curry directed Evans to dump the wastewater in the back. However, Roach and Curry are not similarly situated because neither Roach nor Curry actually committed illegal dumping. Evans concedes that he is not aware of any other Altec employee who

was found to have dumped wastewater into a storm sewer but was not discharged. ([Filing No. 33-4 at 57](#)). The Court finds that Altec has presented a legitimate, nondiscriminatory reason for the termination decision. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997) (violation of plant rules was legitimate, nondiscriminatory reason for employee's discharge). Based on the designated evidence, a reasonable juror could not conclude that Evans would have kept his job if he was simply not a member of the protected class. Because Evans has not put forth a similarly-situated comparator that was treated more favorably and he was not meeting Altec's legitimate expectations, summary judgment is **granted** in favor of Altec on his disability discrimination claim.

### A. Retaliation

Title VII prohibits an employer from acting in retaliation against employees who oppose any practice made unlawful under Title VII. 42 U.S.C. §2000e-3(a). A plaintiff may establish a *prima facie* case of retaliation using either the direct or indirect method. *Stone v. City of Indianapolis Pub. Util. Div.,* 281 F.3d 640, 642 (7th Cir. 2002). To prove his *prima facie* case, Evans must demonstrate: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. *Id.* at 644.

Evans contends that Altec's stated reason for terminating him was pretextual. Specifically, he alleges that he was harassed because of his work restrictions and for filing a worker's compensation claim. ([Filing No. 35 at 21-22](#)). He argues a causal connection in that his worker's compensation claim was filed in early January 2015, and his employment was terminated six months later, in July 2015. ([Filing No. 35 at 21](#)). Generally, an employee at will may be discharged without cause. *Watkins v. Sommer Metalcraft Corp.*, 844 F. Supp. 1321, 1326 (S.D. Ind. 1994).

Causation may be shown by proximity in time or evidence that the employer's asserted lawful reason for discharge is pretext. *Id.*

Altec cites to *Frampton v. Central Indiana Gas Co.*, for the proposition that Evans must demonstrate that he was discharged "solely" in retaliation for the exercise of his worker's compensation rights. 297 N.E.2d 425, 428 (Ind. 1973). In support of his position, Evans points to the six-month time lapse coupled with the negative comments about his medical restrictions and the fact that of the three individuals involved in the dumping, he was the only person discharged.

In response, Altec notes that Evans fails to provide any evidence to suggest that the decision-maker, Peele, was ever made aware of the comments made by his coworkers or Charlie, and notes that only Evans committed illegal dumping. Evans must establish by a preponderance of the evidence that Altec's proffered reason is (1) factually baseless, (2) in not the actual motivation for the discharge, or (3) is insufficient to motivate his discharge. *Best Formed Plastics, LLC v. Shoun*, 51 N.E.3d 345, 351 (Ind. Ct. App. 2016). Under the circumstances here, it is undisputed that Peele believed that Evans alone dumped the oil and wastewater into the public drain and this action alone is sufficient motivation for the discharge decision. Evans has presented no evidence that Altec's stated reason for his termination was pretext.

Finally, Evans cannot show that there is a causal connection between the filing of his worker's compensation claim and his termination nor that his discharge was solely in retaliation for the exercise of his worker's compensation rights. He argues that based on timing, there was an "ulterior motive" behind the stated reason for his termination. ([Filing No. 35 at 22](#)). Evans suspicious timing argument fails. Speculation based on suspicious timing alone does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions. *Stagman v. Ryan*, 176 F.3d 986, 1001 (7th

Cir.1999). There is no factual evidence that Evans workers' compensation claim six-months earlier, had anything to do with Peele's decision. In *Longstreet v. Illinois Dept. of Corrections*, the Seventh Circuit held that an alleged retaliation that occurred four months after a complaint was filed was insufficient to show suspicious timing. 276 F.3d 379, 384 (7th Cir. 2002). Simply stated, Altec had a legitimate reason to terminate Evans for unlawful dumping, accordingly, summary judgment is granted on the retaliation claim.

### B. CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment ([Filing No. 33](#)), is **GRANTED**. Summary judgment is granted to Defendant on all claims asserted by Evans. The Court will issue Final Judgment under separate order.

Date: 5/30/2018

*Tanya Walton Pratt*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jeffrey Scott Beck
FAEGRE BAKER DANIELS LLP (Indianapolis)
jeffrey.beck@FaegreBD.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC
ad@bdlegal.com

Ryann E. Ricchio
FAEGRE BAKER DANIELS LLP (Indianapolis)
ryann.ricchio@faegrebd.com

Ryan William Sullivan
BIESECKER DUTKANYCH & MACER, LLC
rsullivan@bdlegal.com